1

2

3

4

5

6

7

8                  IN THE UNITED STATES DISTRICT COURT

9                     FOR THE DISTRICT OF OREGON

10                        PORTLAND DIVISION

11   **ARCH CHEMICALS, INC.,**
     a Virginia corporation, and
12   **LEXINGTON INSURANCE CO.,**
                                        No. 07-1339-HU
13                  Plaintiffs
          v.
14                                      OPINION AND ORDER
     **RADIATOR SPECIALTY COMPANY,**
15   a North Carolina corporation,

16                  Defendant.

17

18

19   M. Robert Smith
     Joseph Rohner IV
20   Dennis N. Freed
     Ryan J. McClellan
21   Smith Freed & Eberhard
     111 S.W. Third Avenue, Suite 4300
22   Portland, Oregon 97204

23   Thomas D. Allen
     Amber E. Tuggle
24   Shawn D. Scott
     Earl W. Gunn
25   Mark R. Johnson
     Laura Voght
26   Weinberg, Wheeler, Hudgins, Gunn & Dial
     50 East Paces Ferry Road, Suite 3000
27   Atlanta, Georgia 30326
          Attorneys for plaintiffs
28
     William G. Earle
     Paul R. Xochihua

Jonathan Henderson
Davis Rothwell Earle & Xochihua
1300 S.W. Fifth Avenue, Suite 1900
Portland, Oregon 97201

Daniel F. Mullin
John A. McHugh
Mullin Law Group
101 Yesler Way, Suite 400
Seattle, Washington 98104
     Attorneys for defendant

HUBEL, Magistrate Judge:

    This is an action by Arch Chemicals, Inc. (Arch) against Radiator Specialty Company (RSC), asserting claims for common law indemnity and contribution.  Arch seeks recovery of amounts paid in settlement of a lawsuit against Arch brought by members of the Davidson family.  Before the court are RSC's Motion for Summary Judgment (doc. # 317), Arch's Motion for Partial Summary Judgment (#314), and RSC's Motion to Strike Expert Opinion and/or for Fed. R. Evid. 104 Hearing (doc. #321).

**FACTS**

    This case arises out of the wrongful death and bodily injury claims brought by the Davidson family against Arch Chemicals.

    On June 20, 2002, the Davidson family, parents Loran and Eyvette, and children Ben, Lucien, and Janesse, were riding in their 1997 GMC Suburban.  In the rear of the car, among other things, were Arch's product, a swimming pool chemical containing calcium hypochloride (CalHypo) called Sock-It, and three cans of RSC's Gunk Heavy Duty Engine Brite degreaser, EB-1.  The Engine Brite cans were in one or more plastic shopping bags.  Also present in the rear of the vehicle were four bags of planting soil, Coppertone Sports Spray, and several other items.

2 - OPINION AND ORDER

At approximately 8:50 p.m. Mrs. Davidson heard a hissing sound, looked back, saw a flash, and a fireball shot to the front of the car, burning her hands and head.  The car was engulfed in flames before Mr. Davidson could steer it off the road into a ditch.  Mr. and Mrs. Davidson, and their son Ben were severely burned, but were able to escape from the vehicle alive.  The fire and heat in the car gained intensity so quickly that no one was able to get near enough to the car to rescue Lucien and Janesse from their car seats before they were killed by the fire.

Following the fire, state police, fire department officials, and agents from the Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") investigated the source of the fire.  ATF agents conducted reactivity tests with Sock It and Engine Brite, and one test resulted in an exothermic reaction that caused a fire.  Shortly thereafter, police issued a press release indicating they believed the fire was caused by the accidental commingling of Sock It and Engine Brite.

On April 20, 2004, the Davidson family brought a lawsuit against Arch in Oregon Circuit Court alleging civil claims related to the fire.  The Davidsons alleged that the personal injuries and wrongful deaths experienced by their family were a result of Sock It causing a fire in the back of their vehicle.  The amended complaint sought over $200,000,000 for compensatory damages and $200,000,000 for punitive damages.  The litigation was resolved by a confidential settlement on December 7, 2006, for less than the amount sought in the complaint.  The confidential settlement agreement was silent on the topic of punitive damages.  It did, however, make clear the sums paid were, according to all

3 - OPINION AND ORDER

1  signatories, designated as damages on account of personal physical

2  injuries or sickness within the meaning of Section 104(a)(2) of the

3  Internal Revenue Code and Section 130(c) of the Internal Revenue

4  Code.

5      On September 7, 2007, Arch brought the instant lawsuit against

6  RSC, seeking contribution for RSC's role in causing the fire.

7  **STANDARDS**

8      Summary judgment is appropriate when there is no genuine issue

9  as to any material fact and the moving party is entitled to a

10 judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial

11 burden is on the moving party to point out the absence of any

12 genuine issue of material fact. Once the initial burden is

13 satisfied, the burden shifts to the opponent to demonstrate through

14 the production of probative evidence that there remains an issue of

15 fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323

16 (1986). On a motion for summary judgment, the evidence is viewed

17 in the light most favorable to the nonmoving party. Universal

18 Health Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir.

19 2004).

20 **DISCUSSION**

21     In Arch's Motion for Partial Summary Judgment, it asks the

22 court to find, first, that Arch's settlement with the Davidsons in

23 the underlying litigation was reasonable. Second, Arch asks the

24 court to find that punitive damages were not included in the

25 settlement.

26     RSC moves for summary judgment, first, on the issue that Arch

27 cannot recover contribution from RSC because it has not admitted

28 any liability. Finally, RSC moves for summary judgment that there

4 - OPINION AND ORDER

is no issue of material fact Arch's product, Sock-It, and not Engine Brite, caused the fire in the Davidson vehicle.

I address each issue in turn.

I.   Whether the Underlying Settlement was Reasonable

Arch seeks the court's ruling on summary judgment that the amount of the settlement in the underlying litigation was reasonable under ORS 31.800. The settlement was confidential, and submitted under seal for the court's consideration. In order to preserve the confidentiality of the settlement, the court will not discuss the exact amount that Arch offered and the Davidsons accepted.

The relevant section of ORS 31.800, entitled "Joint liability in tort; right of contribution; settlement; subrogation; indemnity," reads,

> A tortfeasor who enters into a settlement with a claimant is not entitled to recover contribution from another tortfeasor whose liability for the injury or wrongful death is not extinguished by the settlement *nor in respect to any amount paid in a settlement which is in excess of what is reasonable.*

ORS 31.800(3) (emphasis added). The statute protects a contribution defendant from having to pay in excess of what was reasonable. Jensen v. Alley, 128 Or. App. 673, 677, 877 P.2d 108, 110 (1994). Whether a settlement is reasonable is a question of fact. See Fisher v. Wofford, 276 Or. 603, 610-11, 556 P.2d 127, 132 (1976) (interpreting the Oregon Supreme Court's ruling in Owings v. Rose, 262 Or. 247, 497 P.2d 1183 (1972), that "such evidence [was] enough to permit *a jury to find* that the settlement was reasonable) (emphasis added); see also Jensen, 128 Or. App. at 678, 877 P.2d at 111 ( "Those documents were sufficient evidence

from which *a fact finder could conclude that the settlement was
reasonable*.") (emphasis added).  Therefore, a court may only find
on summary judgment that a settlement was reasonable if there is no
genuine issue of material fact from which a fact finder could
conclude it was not reasonable.  See Fed. R. Civ. P. 56(c).

The leading Oregon case pertaining to whether a settlement is
reasonable under ORS 31.800 is Jensen v. Alley.  In Jensen, the
defendant farmer hired the plaintiff crop duster to spray
insecticide on defendant's mint crop. 128 Or. App. at 675.  After
the crop duster sprayed, neighbors brought trespass and negligence
claims against both the farmer and the crop duster, seeking $87,000
in damages.  Id.  Before trial, the crop duster's insurance company
settled all of the neighbors' claims against both the farmer and
the crop duster for $60,000.  Id.  Two years later, the crop duster
sued the farmer for contribution, "alleging that [the farmer] was
negligent and that plaintiff had paid in excess of [its]
proportional share of the liability in the settlement" under ORS
18.440.[1]  Id.  At trial the farmer's motion to exclude evidence of
the settlement was denied, but the court ordered that the crop
duster would have to prove all the damage and liability details of
the underlying case.  Id.  Unprepared to make such a showing, the
crop duster made an offer of proof regarding the farmer's
liability, a copy of the complaint in the underlying action and a
copy of the release settling the underlying case.  Id.  At the

---

[1] ORS 18.440 was renumbered ORS 31.800 in 2003.  I note that
the language of the former statute is identical to that of the
current statute.

6 - OPINION AND ORDER

1  conclusion of the hearing, the farmer moved for dismissal of the
2  case for insufficient evidence.  Id.  The trial court dismissed the
3  case, finding the crop duster had established a prima facie case of
4  common liability, but that he had failed to show damages with
5  sufficient specificity.  Id.  On appeal, "the sole issue [was]
6  whether plaintiff's offer of proof . . . [established] a prima
7  facie case that plaintiff's settlement with the [neighbors] . . .
8  was reasonable."  Id. at 677.  The crop duster had presented
9  evidence that in the underlying complaint, the neighbors alleged
10 they lost 78 percent of their crop and suffered damages of roughly
11 $87,000.  Id.  He had also presented evidence that he'd settled the
12 claims for $60,000.  Id.  The Court of Appeals reversed the trial
13 court's dismissal of the case, writing, "Those documents were
14 sufficient evidence from which a fact finder *could* conclude that
15 the settlement was reasonable.  Plaintiff therefore presented a
16 prima facie case of reasonableness under the contribution statute."
17 Id. (emphasis original).

18     The record on this motion by plaintiff and Jensen preclude
19 entry of summary judgment against plaintiff on the reasonableness
20 of the settlement.  It does not, however, entitle the plaintiff to
21 summary judgment in its favor on this issue.  The jury need not
22 accept this limited record, especially when it is controverted by
23 defendant.

24     Arch, however, argues strenuously that, along with Jensen,
25 another Oregon case, Owings v. Rose, 262 Or. 247, 497 P.2d 1183
26 (1972), which discusses reasonableness in the context of an
27 indemnity claim, supports its assertions that either no reasonable
28 juror could find the settlement unreasonable, or that this court

7 - OPINION AND ORDER

1  can find that Arch's settlement with the Davidsons was reasonable

2  as a matter of law given the evidence presented in this case.

3     In _Owings_, the plaintiff architects employed the defendants as

4  consulting engineers on two construction projects. 262 Or. at 249.

5  Omark engaged the architects to design and oversee the construction

6  of a manufacturing plant. _Id._ at 250.  On completion, the floor of

7  the manufacturing plant was defective, and Omark sued the

8  architects.  _Id._ at 251.  The damages claimed by Omark totaled

9  $344,296.  _Id._  The action was settled for $145,000, of which the

10 architects contributed $108,200.  _Id._  The architects then sought

11 indemnity from consulting engineers for the amount plaintiffs

12 contributed to the settlement plus their other costs incurred in

13 defending against Omark's claim, totaling $125,659.24.  _Id._  The

14 case went before a jury who found the settlement reasonable.  _See_

15 _id._ at 257.  On appeal, the Oregon Supreme Court discussed the

16 reasonableness of the settlement,

17
    There was evidence that it would cost $184,000 to repair
    and resurface the floor, which figure did not include any
18  of Omark's own costs associated with the job, such as
    moving machinery and shutdowns.  There was also evidence
19  that settlement negotiations extended over several
    months, that depositions had been taken and the facts
20  investigated, and that all the parties were represented
    by counsel . . . . In this case there is not merely the
21  fact that a settlement was paid.  It is clear that the
    agreement was reached after extensive arm's length
22  negotiation, and that the amount of the settlement was
    far less than Omark's potential costs. _This is enough to_
23  _permit the jury to find that all or a part of the_
    _settlement was reasonable._
24
25 _Id._ (emphasis added).

26    _Owings_, then, stands for the proposition that where a jury

27 finds a settlement reasonable, and there is evidence to support

28 such a finding, a court will not disturb the finding of

8 - OPINION AND ORDER

reasonableness.

To grant plaintiff's motion would be to preclude the fact finder from considering whether the settlement was reasonable. Arch's cases do not support granting this motion.

In opposition to Arch's motion, RSC submitted the opinion of its expert, Ralph Spooner, which reads, in part

> The settlement amounts were reasonable *given* the nature of Arch Chemicals, Inc.'s product, the history of product claims, the nature and extent of the injuries and death caused by the product and Arch Chemicals, Inc.'s approach to the defense of those claims. *However,* if Arch Chemicals, Inc. had implemented a more appropriate defense plan as outlined in answer to Question 1 above, the settlement amounts would have been approximately 25% less.

Decl. Joseph Rohner Ex. 2, at 8. Spooner's answer to Question 1, generally asserts that Arch's attorneys should have advised their client that given the history of problems with Sock It, Arch would likely be found liable to the Davidsons, and thus it would have been less costly to settle with the Davidsons at the outset. Id. at 6-7. Instead, Arch's attorneys focused on denying and defending liability and damages, and likely caused additional anger and resentment in the Davidsons, because Arch "attempt[ed] to avoid responsibility even though liability [was] reasonably clear." Id. at 7-8. Offering settlement at an earlier juncture would have resulted in a lower, more reasonable settlement amount, because, according to Spooner, it would have reduced the amount the Davidsons were willing to accept because "[w]hen plaintiffs realize that a defendant is accepting responsibility, their demands are usually more reasonable." Id. at 8.

Spooner's opinion generally addresses what settlement was reasonable at two points in time. It addresses what a reasonable

9 - OPINION AND ORDER

1  settlement would have been if Arch had offered settlement early in
2  the litigation and if it had avoided the aggressive denial and
3  defense strategy it employed. It also addresses what was
4  reasonable further down the road, once Arch had committed itself to
5  its defense strategy. No Oregon case has performed a temporal
6  analysis of the reasonableness of settlement before and after
7  strategic litigation decisions were made. Given the case law
8  indicating that reasonableness is a question of fact, and given the
9  report of Mr. Spooner, the court finds that an issue of fact
10  remains regarding whether Arch's settlement with the Davidsons was
11  reasonable. On the record before the court, this issue should
12  properly be left for the jury at trial. Accordingly, Arch's motion
13  for summary judgment that the settlement with the Davidsons was
14  reasonable is denied.

15  II.  <u>Punitive Damages</u>

16  The second part of Arch's motion asks the court to hold there
17  is no genuine issue of material fact that Arch's settlement with
18  the Davidsons in the underlying litigation did not include any
19  payment for punitive damages.

20  Settlement agreements are interpreted in light of the usual
21  rules of contract interpretation. <u>Terrain Tamers Chip Hauling,</u>
22  <u>Inc. v. Ins. Marketing Corp. of Ore.</u>, 210 Or. App. 534, 539, 152
23  P.3d 915, 917 (2007). Under Oregon law, the interpretation of a
24  contract is a question of law for the court. <u>Hoffman Construction</u>
25  <u>Co. v. Fred S. James & Co.</u>, 313 Or. 464, 469, 836 P.2d 703 (1992).
26  The court's goal is to give effect to the intention of the
27  contracting parties. <u>Anderson v. Jensen Racing, Inc.</u>, 324 Or. 570,
28  575-76, 931 P.2d 733 (1997); ORS 42.240 (in the construction of a

10 - OPINION AND ORDER

written instrument the intention of the parties is to be pursued if possible).

Here, when the Davidsons sued Arch in state court they could not initially allege a claim for punitive damages.  ORS 31.725.  They were required to, and did, file a motion seeking leave to allege a punitive damages claim, which was granted.  Their amended complaint alleged $200 million for compensatory damages and $200 million for punitive damages.  When the parties settled, however, the language of the settlement agreement expressly set forth that the sums paid constituted damages for personal physical injuries or sickness within the meaning of Section 104(a)(2) of the Internal Revenue Code and physical injuries or sickness within the meaning of Section 130(c) of the Internal Revenue Code.[2]  The exclusion of

---

[2] Section 104, entitled "Compensation for injuries or sickness," reads, in part,

> (a) In general.--Except in the case of amounts attributable to (and not in excess of) deductions allowed under section 213 (relating to medical, etc., expenses) for any prior taxable year, gross income does not include--
>
> . . . .
>
> (2) the amount of any damages (*other than punitive damages*) received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal physical injuries or physical sickness;

26 U.S.C.A. § 104 , I.R.C. § 104 (emphasis added).  Section 130, entitled "Certain personal injury liability assignments," reads, in part,

> (a) In general.--Any amount received for agreeing to a qualified assignment shall not be included in gross income to the extent that such amount does not exceed

11 - OPINION AND ORDER

punitive damages from § 104(a)(2) of the Internal Revenue Code seems to clearly mean the parties to the settlement did not intend any payment thereunder to include any amount for punitive damages. This all leads me to interpret the settlement agreement to mean the parties intended to settle all the Davidsons' claims, but that the payments were only for compensatory damages. Indeed, it would not have been in either parties' interests to pay any amount for punitive damages.

In Oregon, when a party is awarded punitive damages at trial, sixty percent of the punitive damages award is allocated to Oregon's Criminal Injuries Compensation Account of the Department of Justice Crime Victims' Assistance Section. ORS 31.735(1)(b). However, "the parties to litigation sometimes eliminate[] the state's potential interest in a punitive damages award by settling the case before a judgment [is] entered." Patton v. Target Corp., ___P.3d___, 2010 WL 4539445, at *6 (Or. Nov. 12, 2010). If "the settlement does not include any payment for punitive damages . . . there is no provision in the settlement for any payment to the state." Id. at *1.

_____

the aggregate cost of any qualified funding assets.

. . . .

(c) Qualified assignment.--For purposes of this section, the term "qualified assignment" means any assignment of a liability to make periodic payments as damages (whether by suit or agreement), or as compensation under any workmen's compensation act, on account of personal injury or sickness (in a case involving physical injury or physical sickness)--

26 U.S.C.A. § 130 , I.R.C. § 130.

12 - OPINION AND ORDER

1    As a logical matter, then, both parties had incentives not to
2  include payments for punitive damages. For the Davidsons,
3  including punitive damages would have meant that a large portion of
4  any payments for such damages would have been allocated to the
5  state. For Arch, the inclusion of payment for punitive damages
6  would have precluded recovery for those sums in a suit for
7  contribution such as the instant one, and perhaps increased the
8  likelihood other future plaintiffs would demand punitive damages.

9    Accordingly I hold that the underlying settlement with the
10 Davidsons did not contain any payment for punitive damages.

11   RSC argues that even if the settlement did not contain payment
12 for punitive damages, Arch's willful, wanton, or malicious conduct
13 in causing injury to the Davidsons could still result in the jury
14 in this case apportioning some part of the settlement for punitive
15 damages. RSC then points out that contribution is not available
16 for anything attributed to punitive damages. This argument is
17 unavailing.

18   When the Davidsons elected to settle their claims for
19 compensatory damages with Arch, as consideration they released all
20 claims for all types of damages, including punitive damages,
21 against Arch, RSC, and any other parties arguably responsible. But
22 to the extent the Davidsons had claims for punitive damages, they
23 did not receive, and Arch did not pay, anything for those claims.
24 Therefore, the court's holding is that the entire amount Arch paid
25 the Davidsons was for compensatory damages and not for punitive
26 damages.

27   Had a jury been empaneled in the Davidson claim and returned
28 a verdict solely for compensatory damages and nothing for punitive

damages, RSC would not be in a position to argue that Arch, having paid such a judgment, was unable to seek contribution for some portion of the judgment as punitive damages. When a party settles a claim they are able to contractually limit the damages they are required to pay, both in amount and type. The certainty parties negotiate for in a settlement would not exist if RSC was able to litigate Arch's potential liability for punitive damages in this contribution claim. There is no case law authorizing this and I hold it is not allowed on this record. As a result, the issue of potential liability for punitive damages is not relevant for the trial of this case.

III. <u>Contribution</u>

 A.  <u>Admission of Liability Not Required for Contribution Claim</u>

 RSC argues that Arch cannot recover contribution from RSC because Arch has not admitted any liability and Oregon's contribution statute, ORS 31.800, requires joint liability. According to RSC, in order to state a contribution claim, Arch must allege and put on proof that Arch itself was liable to the Davidsons, which it has not done.

 The language of the contribution statute, entitled "Joint liability in tort; right of contribution; settlement; subrogation; indemnity," reads, in part,

> (1) Except as otherwise provided in this section, where two or more persons become jointly or severally liable in tort for the same injury to person or property or for the same wrongful death, there is a right of contribution among them even though judgment has not been recovered against all or any of them. There is no right of contribution from a person who is not liable in tort to the claimant.

> (2) The right of contribution exists only in favor of a

14 - OPINION AND ORDER

tortfeasor who has paid more than a proportional share of the common liability, and the total recovery of the tortfeasor is limited to the amount paid by the tortfeasor in excess of the proportional share. No tortfeasor is compelled to make contribution beyond the proportional share of the tortfeasor of the entire liability.

(3) A tortfeasor who enters into a settlement with a claimant is not entitled to recover contribution from another tortfeasor whose liability for the injury or wrongful death is not extinguished by the settlement nor in respect to any amount paid in a settlement which is in excess of what is reasonable.

ORS 31.800(1)-(3). The Oregon Court of Appeals has stated, based on the statute, that the four elements of a claim for contribution by a tortfeasor settling with the tort victim are: (1) joint liability in tort for the same injury; (2) payment by the contribution plaintiff of more than a proportional share of the common liability; (3) settlement extinguishing the contribution defendant's liability for the injury or wrongful death; and (4) settlement that was not in excess of what was reasonable for the injury or wrongful death. Jensen v. Alley, 128 Or. App. 673, 677, 877 P.2d 108, 110-11 (1994). "The proportional shares of tortfeasors in the entire liability shall be based upon their relative degrees of fault or responsibility." ORS 31.805. The relative degrees of fault of the tortfeasors is a question for the finder of fact. Ingram v. ACandS, Inc., 977 F.2d 1332, 1341 (9th Cir. 1992) (analyzing former ORS 18.445, renumbered ORS 31.805).

Here, Arch settled with the Davidsons to avoid a jury's determination of its liability to the Davidsons. Arch sued RSC for contribution on the theory that RSC shared an unspecified percentage of the liability to the Davidsons. A contribution claim, does not, however, require that Arch, the contribution

15 - OPINION AND ORDER

plaintiff, admit a certain percentage of fault and produce evidence
to prove it.   Rather it is Arch's burden to prove the four elements
above convincing the finder of fact that it paid the Davidsons more
than its proportional share of the common liability of Arch and
RSC.   The determination of the proportional degrees of fault is a
question for the jury at trial.[3]   It is clear that RSC will do all
it can to prove Arch's liability for the fire and the Davidson's
injuries.

Accordingly, RSC's motion for summary judgment as to this
aspect of Arch's claim for contribution is denied.

B.   <u>Theory of Liability in Claim for Contribution</u>

Alternatively, RSC argues that Arch cannot assert common
liability with RSC for a theory other than the theory alleged by
the Davidsons in the underlying complaint.   In the underlying
action, the Davidsons alleged that Sock It started the fire in
their car after it commingled with another product.   According to
RSC, under precedent set forth in the District of Oregon, Arch can
only seek contribution from RSC on a commingling theory of
causation, but not on a spark theory.

The cases cited by RSC, however, do not support its
contention.

In <u>Country Mut. Ins. v. Gyllenberg Const., Inc.</u>, No. CV-03-
856-ST, 2004 WL 1490326, at *1 (D. Or. July 2, 2004), a home
suffered water damage allegedly due to its roof.   2004 WL 1490326,

---

[3] In the unlikely event on this record that the jury
determines that Arch bore no liability for the fire and the
Davidsons' injuries, the proper judgment will be the subject of
trial's perhaps post-trial briefing.

16 - OPINION AND ORDER

at *1.  Plaintiff Country Mutual, who insured the house, paid the homeowners roughly $85,000 pursuant to the policy.  Id.  Country Mutual then sought subrogation from Gyllenberg Construction, the company that built the house.  Id.  Country Mutual brought a claim for negligence against Gyllenberg, "essentially alleging that Gyllenberg acted as an architect by negligently designing a cold roof system and negligently selecting materials that were inadequate for use on a roof in Baker City."  Id. at *13. Gyllenberg, in turn, brought a contribution claim against a third party, Bronson, for failure to distribute an adequate roof product. Id. at *1.  Bronson argued that to the extent Gyllenberg's claim was in the nature of products liability, it was barred by the statute of limitations.  Id. at *10.  Country Mutual clarified in response that it's claim against Gyllenberg was for "negligent selection of a nondefective product."  Id. at *11.

Analyzing Country Mutual's negligence claim, Judge Stewart wrote,

> Even though Country alleges . . . a claim for negligent design and selection, Gyllenberg still cannot obtain indemnity or contribution claim . . . from Bronson.  In order to be liable for indemnity or contribution, Gyllenberg must prove that Bronson could be liable to Country in some way.  However, if the only basis for Country's claim is Gyllenberg's negligent design and selection, there is no circumstance under which Bronson owed any liability to Country.

Id. at *12.  The court explained, "Gyllenberg cannot pass liability for its own negligent design and selection to a third-party from whom the plaintiff, Country, never sought recovery."  Id. at *13.

Judge Stewart's ruling, however, is distinguishable from the instant case.  Judge Stewart's plaintiff claimed it was not alleging a products liability claim against the contractor who

17 - OPINION AND ORDER

designed and selected the roof, but rather that the defendant negligently changed the originally specified roof to the one supplied by the third party defendant who was sued for contribution. Since the defendant in Judge Stewart's case was alleging a contribution claim on a theory of product liability against the roofing manufacturer/third party defendant for negligently designing and manufacturing its roofing product which the defendant installed, Judge Stewart addressed whether these factually different theories could support a contribution claim. After clarifying the allegations in the case pending before her as outlined above, Judge Stewart found it necessary to discuss the nature of the her plaintiff's claim and the nature of the contribution claim. In doing so she discussed two cases, Hoover v. Montgomery Ward, 270 Or. 498, 529 P.2d 76 (1974) and Jamison v. Spencer R. V. Center, Inc., 98 Or. App. 529, 779 P.2d 1091 (1989). Thus, a discussion of Hoover and Jamison and Judge Stewart's reasoning in reaching her conclusion that the claim in her case was not a products liability action is necessary.

Hoover involved a case where the defendant sold and mounted tires on plaintiff's car. The plaintiff claimed that the defendant failed to properly tighten the lug nuts allowing the accident and injuries to occur. The court needed to determine if the claim was a products liability claim or not. It held that the essence of the claim was negligently installing a non-defective product, the tires. Thus, the Oregon Supreme Court concluded plaintiff's claim was not a strict product liability claim.

Jamison involved a plaintiff claiming that the defendant seller negligently installed a non-defective trailer hitch and

18 - OPINION AND ORDER

that, therefore, following Hoover, plaintiff was not making a strict products liability claim. The Court of Appeals noted, however, that the negligent installation alleged was the fabrication of inadequate welds between several parts of the trailer hitch and installing a bar that was too short and weak to handle the expected loads for the hitch system. The defendant in Jamison argued that the nature of the installation was more like creation of a product than was the case in Hoover, apparently based upon the differences between selecting the bar and welding on the one hand and the simple tightening of lug nuts on the other. The Court of Appeals agreed with the defendant and determined this was a strict product liability action.

In evaluating the plaintiff's claim in her case and the defendant's third party claim for contribution, Judge Stewart found that her plaintiff's claim was closer to Hoover in that it did not claim any negligence by her defendant in the manner in which he installed the roof such as poking holes in the sheets of roofing or otherwise. Judge Stewart also noted there was no claim by her plaintiff that the roofing sheets were defective when sold, for instance because they had holes in them, or were structurally weak. Rather her plaintiff was claiming the defendant negligently chose perfectly good roofing material that was not designed for the conditions the roof would be subjected to in its location. Thus Judge Stewart's plaintiff did not allege a products liability claim. Since Judge Stewart's plaintiff did not allege a theory of liability that could ever implicate the defendant roofing manufacturer/seller, she concluded there could be no common liability and therefore no contribution claim.

19 - OPINION AND ORDER

1   There was apparently no occasion to address on Judge Stewart's
2   record the issue of whether the defendant there contended that
3   despite the plaintiff's allegations, there were in fact defects in
4   the roofing as manufactured and sold which contributed to the loss
5   plaintiff alleged.  I know of no case which prohibits a defendant
6   from pursuing a contribution theory, if indeed it has the evidence
7   to prove it, that a combination of the theory the plaintiff alleged
8   against the defendant, and a theory the defendant alleges against
9   the third party defendant, which while different, are nonetheless
10  each found at trial to have occurred, and to have combined to cause
11  plaintiff's loss.

12      Here, I am presented with a case where the Davidsons alleged
13  a products liability claim against Arch based upon the theory that
14  its product commingled with other products in the car and caused
15  the fire and resulting injuries and deaths.  Arch now claims in
16  this case that RSC's product was involved in causing the fire as
17  well.  The allegations are that EB-1 was defective, i.e. this is a
18  products liability based contribution claim.  The fact that it is
19  based alternatively on the same commingling theory the Davidsons
20  pursued and a different theory of a spark igniting the
21  inadvertently discharged EB-1 product and the ensuing fire then
22  involving the Arch product does not, in Judge Stewart's words,
23  amount to a difference in claims such that "...there is no
24  circumstance under which [RSC could have been liable to the
25  Davidsons.]" Country Mutual, 2004 WL, at *12.

26      In Ironwood Homes, Inc. v. Bowen, ___ F.Supp.2d ___, 2010 WL
27  2465382, at *1 (D. Or. June 14, 2010), two deceased farm owners
28  allowed a nearby tannery to use their farm as a dumping ground for

20 - OPINION AND ORDER

waste products.  Since 1980 the EPA was involved with investigating the farmland for releases of chromium.  The plaintiffs apparently paid the costs of remediating the contamination.  The parties to the litigation were the current landowners, former landowners, developers, financial institutions, and the successors to the tannery operation, all of whom sought contribution from one another for any liability they might have with regard to cleanup costs.

The plaintiffs sued their bank, which loaned funds for the project and later loaned more funds toward remediation costs, for fraudulent concealment and reckless misrepresentation of the environmental risks associated with the property.  The successors to the operators of the tannery also sued the plaintiff's bank for contribution to any liability the tannery operators and their successors may have for clean up costs contending that had the plaintiff's bank not concealed the facts from plaintiffs the plaintiffs would never have purchased the property and therefore never been liable for any portion of the remediation costs.

Judge Brown analyzed this claim for contribution under both the O.R.S. 31.800, Oregon common law, and under O.R.S. 465.255(1)(a)-(e).  Judge Brown noted there was no common law right to contribution in Oregon.  She also found that since the theory of liability of the tannery defendant, if any, was for contaminating the land in the first place, and the lender's liability if any was for concealing the fact of potential contamination from later purchasers of the land who were liable for remediation costs by the mere fact of owning the land, there was no common liability and therefore no right of contribution under O.R.S. 31.800.  The tannery defendant was potentially liable for remediation costs

21 - OPINION AND ORDER

completely independent of any responsibility of the plaintiffs. Judge Brown went on to find that O.R.S. 465.255(1)(a)-(e) were more specific contribution statutes than O.R.S. 31.800, so that to the extent they could not be harmonized, O.R.S. 465.255(1)(a)-(e) would be an exception to the more general statute. However, O.R.S. 465.255(1)(a)-(e) did not allow contribution for the tannery defendants either as it only allowed contribution if the lender was alleged to have caused or exacerbated the release of contaminants or hindered the investigation and removal of contaminants from the property which was not alleged by anyone against the plaintiff's lender.

The value of this case, if any, to RSC is the decision by Judge Brown with respect to the meaning of common liability. That decision does not address the issue in the case before this court now. Judge Brown's facts did not address a claim for contribution based on two theories of liability one of which was explicitly alleged by the injured plaintiff and one which was not. It also did not address a theory that involved two product manufacturers one of which was sued by the injured plaintiffs for starting a fire and one of which is now also alleged by the first manufacturer to have made a defective product that was also responsible for the start of the fire. RSC wants to split the hairs too thin.

The natural extension of RSC's analysis would mean a defendant could only get contribution if every aspect of the theory of liability plaintiff alleged against that defendant was the same as the theory that the contribution seeking defendant alleges against the new party. One could envision their argument being extended to apply to a situation where a passenger in a car is injured in a two

22 - OPINION AND ORDER

1    car collision and sues the driver of the second car.  That driver
2    tries to sue the driver of the plaintiff's car for contribution and
3    is then faced with RSC's argument that this is an entirely
4    different theory of liability than the plaintiff alleged, therefore
5    no contribution.  If the finder of fact believes that the
6    negligence of the two drivers combined to cause plaintiff's
7    injuries, a contribution claim is appropriate.  Likewise, if the
8    finder of fact in this case believes that both products were
9    defective and that they both caused the fire and resulting loss to
10    the Davidsons, then a contribution claim is appropriate under
11    Oregon law.  The liability is common.  Neither Ironwood Homes, nor
12    Country Mutual hold otherwise.

13       RSC's motion for summary judgment regarding contribution is
14    denied.

15    IV.  Unjust Enrichment

16       Arch raised unjust enrichment in its response to RSC's motion
17    for summary judgment.  The same day Arch raised the issue,
18    Lexington filed its complaint with a claim for unjust enrichment.
19    RSC first addressed this claim/issue in its reply in support of its
20    motion for summary judgment. RSC did not move for summary judgment
21    on Lexington's claim for unjust enrichment.  That claim and the
22    cases and arguments about it form no basis for my ruling on this
23    motion for summary judgment.  I will address the motion to strike
24    Lexington's complaint in a separate opinion.

25    V.  Scientific Evidence and Summary Judgment

26       RSC moves for summary judgment on all theories of contribution
27    based on an argument that there is no evidence that satisfies the
28    Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)

23 - OPINION AND ORDER

1  requirements for expert testimony in support of either the
2  commingling theory or the spark theory.  They also argue that
3  neither theory can survive because they are so unlikely as to
4  amount to speculation and no reasonable juror could find them to be
5  persuasive.   These arguments are in addition to the others
6  discussed above.

7      During the life of this lawsuit, experts on both sides have
8  developed competing theories about how the products at issue may
9  have caused the fire in the Davidson vehicle.  For the instant
10 motion for summary judgment, the parties submitted over one
11 thousand pages of exhibits addressing the theories of causation
12 regarding the fire.

13     I have evaluated the record on this summary judgment and all
14 of its details.  I am denying RSC's motion for summary judgment
15 because I do not find the Daubert challenge successful on the
16 record before me and because there are material issues of fact that
17 preclude summary judgment.  With respect to the implausibility
18 argument raised by RSC, it is not so clear that no reasonable juror
19 could find in Arch's favor, therefore the motion is denied.

20     The overarching issue on this motion for summary judgment,
21 however, is whether there is any issue of fact that a spark ignited
22 Engine Brite causing the fire, or that Sock-It and Engine Brite
23 commingled and a reaction between them caused the fire in the
24 Davidson vehicle.  The central problem with RSC's motion is that
25 Daubert is aimed at novel theories, but there is nothing novel
26 about a spark igniting a petroleum derivative, nor in an exothermic
27 reaction causing a fire.  RSC's motion # 321 is therefore denied.
28 There are material factual issues whether a spark ignited Engine

Brite that had leaked or inadvertently been discharged to start the fire.  There are also factual issues regarding whether Sock It had a chemical reaction with Engine Brite, or some other substance, to start the fire.

**CONCLUSION**

Plaintiff's motion for summary judgment that its settlement with the Davidsons was reasonable is denied.

Plaintiff's motion for summary judgment that its settlement did not involve any payment for punitive damages is granted.

Defendant's motion for summary judgment that plaintiff may not seek contribution from defendant is denied.

Defendants motion to strike expert opinions [doc. # 321] or to hold a FRCP 104 hearing is denied.

IT IS SO ORDERED,

Dated this ___13th___ day of December, 2010.

/s/ Dennis J. Hubel

_____
Dennis James Hubel
United States Magistrate Judge

25 - OPINION AND ORDER